## FERRIS GILES v. THE DIAMOND STATE IRON COMPANY.

### *Master and Servant—Duties—Damages.*

The jury must render their verdict according to the law and the evidence in the case.

The master must provide the servant with safe and proper implements with which to work and a safe place in which to work, and must keep him, while at work, from exposure to danger from any cause or source within the control of the master, and not incident to the employment or trade of the servant. A violation of these duties will entitle the servant to an action for damages against his master.

When a servant voluntarily undertakes a perilous service for his master, and the peril is as well known to the former as the latter, or by the exercise of prudent care on the part of the former (and which it was his duty to take) he might become acquainted with it, he will have no right to an action against his master if he be injured while in the performance of such service.

If the injury is caused by a distinct part of the general work done by other servants, the duty of prudent caution, or circumspection, did not rest with the same weight upon the injured servant as if occasioned by defective work or material within his own particular line of labor, unless the danger was so obvious as to fasten the servant with knowledge of it.

The plaintiff being employed as a carpenter to work upon the roof a building which was being erected by defendant, the walls being completed and part of the roof being on before the beginning of such service, was not bound to inspect the walls of the building to ascertain its safety before going upon the roof; and he is entitled to damages sustained by the falling of said walls, while he was thus engaged.

It having been suggested to defendant that the walls of the building were inadequate in thickness and not in accordance with the requirements of the ordinances of the city in regard to the thickness of walls of buildings, he became liable to any damage sustained by the workman on account of such defect.

If the building would have resisted any usual storm in the latitude, the same as other buildings of large proportions and well built, and if the storm that overthrew it was extraordinary, and such as builders do not provide against or contemplate in planning their architecture, then the defendant is not liable.

If the verdict be for the plaintiff, he is entitled to damages for the expenses incurred in being treated and attended; for his bodily pain and suffering; for hindrance from pursuing his employment, and loss of wages from his disability by reason of its permanency.

In such a case exemplary damages should not be awarded.

*(New Castle, February 19, 1887.)*

ACTION ON THE CASE for personal injuries received by plaintiff while in the employ of defendant.

*Levi C. Bird* for plaintiff cited: notices citation on other side from 2 Thomp. on Negl., 994; 4 Ore., 52, 56. Secondly, that the defendant and plaintiff had equal knowledge or means of

knowledge of the defects or deficiencies in the wall. This was not the case, nor had they the same means of knowledge. What is a patent, and what is a latent defect? It was an unlawful building, contrary to the city ordinance which required such a wall to be seventeen inches thick. [Reads the ordinance.] N. E. Rep., vol. 5, 187; 116 N. S., 652; N. E. Rep., vol. 2, 24; 99 N. Y. Co. Appeals., 368; 26 Am. & Eng., R. R. Cases., 325; At. Reps., vol. 3, 38; N. E. Rep., vol. 7, 877; At. Rep., vol. 6, 437; N. E. Rep., vol., 5, 449; *Wood's Law of Master and Servant*, Sec. 384–5–8; *Whart. on Neg.*, Sec. 217; 76 Pa., 389; 49 N. Y., 521; 106 Mass., 282; 2 Thomp. on Neg., 972, 974, 975; 24 N. Y., 410; N. E. R., vol. 9, 302.

*George Gray*, on the same side: *Whart. on Neg.*, 232; 30 Md., 204; 2 Ell. & Black, 76; 4 Wall., 678; 6 Hurls. & Norm., 488; 4 Hun., 318; 3 Hurls. & Fult., 596; L. R., 5th Queen's Bench, 411; 57 N. Y., 567; *Smith on Neg.*, 419. These authorities all go to the negligence of the defendant in the action. *Whart on Neg.*, Secs., 205, 214; 100 U. S., 214, 216, 218, 222; 7 Hurlst. Norm., 937; *Whart on Neg.*, Sec. 210, note; 45 Ill., 197; 52 Ib., 183; 44 Md., 283; 46 Mo., 163; 2 Hurls. & Norm., 213; Whether the plaintiff was guilty of contributory negligence is a question for the jury, 49 N. Y., 521; *Woods, &c.*, Sec. 388.

*Edward G. Bradford* for defendant cited: The law of master and servant and the law of negligence, either may be involved: 1. Thinness of the wall. 2. One end was left open below the square. The defects or deficiencies in the wall complained of were not latent, but patent to every workman on the roof, having knowledge of them the plaintiff accepted the employment subject to and assumed the risk of it. 1 Houst., 469; *Flinn's Case*, 3 Houst., 176; 4 Houst., 103; 4 Houst., 626; 4 Houst., 583; 3 W. & W., 1; 5 E. L. & Eq. Rep., 265; 9 Ex. Rep., 223; 40 E¹ L. & Eq. Reps., 491; 2 H. & N., 768; 3 H. & N., 648; 11 Exch., 832; 102 E. C. L. Rep., 385; 12 Q. Bench Div., 493; 77 Ill., 256; 110 Ill., 340; 5 Bissell, 315; 2 *Thompson on Neg.*, 994; *Wood on Master and Servant*, Secs. 335, 382; 4 *Waite on Actions and Defences*, 418; 29 Conn., 548, 560; 25 N. Y., 562, 566; 63 N.

Y., 449; 11 N. W. Rep., 559; 4 Ore., 52, 56; 40 Iowa, 341; 27 Min., 137, 140; 31 Cal., 376; 46 Cal., 409; 13 Barb., 9; on non-suit.

*George H. Bates,* for defendant: *Beach on Contr. Neg.,* Sec. 123; *Whart. on Neg.,* Sec. 237, 243, 214, *n. 1; 1 Thomp. on Neg.,* 368, 376; *Whart. on Neg.,* Sec. 420, 421; 3 W. Rep., 393; 5 N. E. Rep., 187; *Woods, &c.,* 382.

*Charles B. Lore,* on same side:

Prayers for Instructions on behalf of the defendant.

1. That upon the evidence the jury must find a verdict for the defendant,—

or, if the first instruction be refused, then as follows:

2. That if ·the jury from the evidence believe that the defendant in and about the planning and erection of the building in question exercised the same care that should have been used by an ordinarily prudent man with respect to the planning and erection of such a building, then the plaintiff cannot recover.

3. That if the jury, from the evidence, believe that the building in question was defective by reason of the thinness of the brick wall and the fact that the southerly end of the building was left open below the square, or in either of these respects, such defects were patent, and the plaintiff being bound to know them, assumed whatever risk was connected therewith, and cannot recover.

4. That upon the evidence the plaintiff was bound to know the thickness of the brick wall of the building in question and the fact that the southerly end of the building was left open below the square, and that if the jury, from the evidence, believe that the defendant had not, during the planning or erection of the building, any notice or idea that the building was or would be dangerous, the plaintiff must be considered as having assumed whatever risk was connected with the thinness of the wall or the fact that the end of the building was left open, and cannot recover.

5. That if the jury, from the evidence, believe that the plaintiff had equal knowledge or means of knowledge with the defendant as to the risk or danger of the falling of the building in question, the plaintiff cannot recover.

6. That when the plaintiff went to work upon the defendant's premises in the capacity of a carpenter, the defendant had the right to rely upon the plaintiff's competency to perform the duties of his employment and upon his ability to apprehend and avoid all dangers that he might have discovered by the exercise of ordinary care and prudence.

7. That the defendant was not bound in and about the planning and erection of the building in question to provide against storms of unusual violence, but was only bound to exercise that degree of care due from ordinarily careful and prudent men in and about the planning and erection of such a building.

8. That if the jury from the evidence believe that the building in question would not have fallen at the time it did fall, but for wind pressure upon the building, and shall further believe that the building would have fallen under that wind pressure even if the brick wall between the piers had been thirteen (13) inches in thickness, plumb and properly constructed, then the plaintiff cannot recover.

9. That if the jury from the evidence believe that the building in question was improperly planned or constructed and fell by reason of pressure, but that even if properly planned and constructed it would have fallen by reason of that wind pressure, then the plaintiff cannot recover.

10. That in this action the burden of proof is upon the plaintiff to establish negligence on the part of the defendant.

11. That in this action the burden of proof is upon the plaintiff to show due care on his own part.

COMEGYS, C. J. charging, the jury:

*Gentlemen of the Jury :*

You need not be told by me that this is a very important case. Great interest has been manifested by the public in respect to it; it has excited a great deal of attention in the community, and the attendance of the members of the bar here to watch it tends to show the deep interest they take in it also. It is very fortunate that it is committed to a jury so intelligent and well known in the community and so worthy in every way as I know you are.

This is a case, the features of which are peculiar, but after all there is nothing very strange about the law which is applicable to it. The law of negligence has come under review in this Court on several occasions and the Court has uniformly laid it down to the jury as I shall lay it down to you to-day, except so far as I shall be obliged to deviate somewhat on account of the peculiar characteristics of this case and I need not say to you that it is a case in which the jury must be governed by the law and facts in making up their verdict. The law is part of the testimony in the case: it comes from the mouths of the judges, who are sworn to do their duty, and their duty is to deliver the law as they believe the law to be; and therefore there is the same sanction precisely with respect to the deliverance by the Court that there is to that of a witness at the bar of the Court. While your judgments may not approve the law, you are still bound by it; otherwise, there would be no certainty in judicial trials. And you are to be governed by what is said by the witnesses, but you are not bound to believe all that the witnesses say, and you may choose between them which you think are most worthy of credit; but in a case of this kind you are bound to give your verdict to that side upon which, in your judgment, there is the greatest weight of testimony. It is not the *number* of witnesses that prove a fact so that the jury should always be governed by it. Of course, they exercise an influence; but it is the *quality* of the testimony—the matter of *knowing* what they speak of, their manner and demeanor on the stand, and the probability of their testimony being true; and you must give your verdict to that side upon which the greatest weight of testimony is—wherever the *preponderance* of evidence is, there should your verdict be. In other words, you are to render a just

and true verdict according to the evidence in the case; and I am perfectly sure that none of you will be influenced by any consideration of the fact that the defendant in this case is a corporate body and that the plaintiff in this case is a young man without means. You must try it between them as individuals and not allow any feeling of prejudice to exist. I know you will not be influenced by the fact that the defendant is a corporation. It is entitled to the same degree of consideration in this Court as an individual man, and having no greater privileges or rights. If a corporate body has done wrong, it must be held liable for it. If this young man has just grounds of action, you must give him what, in your judgment, is just compensation. But I will say to you now that this is not a case for what is called *vindictive* damages; that is, damages to punish the defendant. There *are* cases where the jury *ought* to give a verdict to *punish* the defendant, where the defendant has been guilty of wilful and gross negligence—paying no sort of regard to the interest of others—because that is something very different from negligence from the simple want of diligence which all business men should observe.

When a man in any business is guilty of gross negligence which endangers the lives of others, he should be punished by being made to pay. I do not think that this is a case of that kind, and therefore, you must base your verdict upon what you think the plaintiff ought to have, if you give him anything at all. I will now proceed :

The defendant in the year of 1885 and before that period was engaged in the business of manufacturing iron in the city of Wilmington, and still pursues the same employment. Its exigencies required that it should erect a new building in addition to those already owned by it; and the witnesses Simpson and Foulk were severally employed by its agents for that purpose. The building was to be partly of brick and the rest of wood, and Simpson was to do the brick work. The witness, William H. Foulk, was employed in like manner to do the wood work. By the contract with Simpson, he was to supply the bricks, lime and mortar for the wall, and and the labor to build it; but this, at the request of the defendant, through its aforesaid agents, was so modified as that the defendant

should furnish the bricks and sand. The building was to be a very large one, viz., 250 feet long, 56 or 57 feet wide and 21 feet high to the square; one side was to be a brick wall 21 feet high from the foundation, and 9 inches (or one brick) thick; with pilasters 16 feet apart from centre to centre, 17 inches (or two bricks) in thickness, and about 26 or 27 inches wide. The wall was, accordingly, built of those dimensions. The other side of the building and one of its ends were built of wood, but the other end was left open from the ground at the instance and by the orders of the defendant through its agents (there was no other floor) to the square of the building. This opening was, of course, about 56 feet wide, by 21 feet high. The 9-inch wall was pierced in the middle of the space between each of the pilasters with an opening for a window, about 4½ feet wide by 7 or 8 feet high, in which window frames were secured. The whole structure was covered by what was called by the witnesses a truss roof, self-supporting and framed, as shown by the plans exhibited. Upon the brick wall was a wooden plate 3 inches thick and 13 wide, and properly secured, where the pieces of it were joined to make it continuous. There were girders resting upon this plate, over each of the pilasters; they were well secured to the wall through the plate, according to the testimony. There was nothing resting upon the 9-inch wall but the plate described. All the actual weight therefore, of the truss frame with its covering of inch boards and longitudinal ventilator of 250 feet, and slating to be done upon the whole, was to be borne by the pilasters, with the lateral support the 9-inch walls between them would give to them. At the time the plans for the building (which were made by one of the defendant's agents) with the specifications, were submitted to and seen by the witness Simpson. He tells you that he suggested to the president of the Company, Mr. Mendinhall, when they had the plans before them and were discussing about the building, that the 9-inch wall looked thin and should be 13 inches—a brick and a-half thicker—giving to him as his reason, as he tells you, that the wall would be *stiffened up* by it. The president, he says, argued to the contrary, and he gave the matter up; but in his second examination in behalf of the plaintiff, he said he was of the same opinion now as he expressed then. If the

witness' suggestion had been adopted, the walls would have been within 4 inches of being as thick as the pilasters. This opinion was given before the work was undertaken; and the plan did not contemplate an open end as described; for, according to the testimony of the witness Foulk, it was during the progress of the work that the order was given him to leave a certain end open. Therefore the expression from Simpson in his conversation with the president was in contemplation of the building being enclosed on all sides, and fastened—the wood work to the brick work, as is usual in connecting houses, the walls of which are some one or more of them, of masonry, and the rest of wood work. The masonry is proved to have been well done and the materials good, as was doubtless in the witness' mind (for he was to build the wall) at the time he made his suggestion to Mr. Mendinhall.

The building not being entirely finished on the 28th of July 1885, the plaintiff went to work upon it, he having been employed for that purpose, as a carpenter, and worked upon the roof that day. The next day, the 29th, he was also at work there, and about the ventilator. While thus employed, according to his testimony, he suddenly became aware of a movement of the roof, which he described, and then the whole structure fell, burying him in the ruins and breaking his left thigh bone and doing him, according to his account, other serious injuries, from the latter of which he says he has never entirely recovered, and by reason of which he states he is unable to work and labor at his calling as before that time he could do. Conceiving and being advised by his counsel that his injuries were not caused by any act, or default of his own, but were occasioned by the inadequate and insufficient brick wall described erected by the defendant through its servant, the witness Simpson, who acted entirely under its orders, he caused this suit to be brought alleging the aforesaid injuries and that they arose from the act of the defendant in building such a wall as that described, and claiming damages according to his ideas of the extent of the calamity which befell him. The defendant resists this suit entirely, contending in the first place that there was no fault on its part in erecting the said wall of the dimensions given; but if there was that the defect in it: as well as the open end of the structure, was as visible and evident to the defendant as to it; and that where such is the

case, that is where danger exists as connected with a service to be rendered by one employed, which danger is entirely open to his observation before he undertakes his service, if injury befell him, he cannot resort to the master for compensation unless he have a contract guaranteeing safety—he taking the risk of the employment in consideration of the wages given.

The plaintiff's service as a carpenter upon the building (he was engaged in that capacity) began on the 28th of July, 1885, when the work upon the whole had been done except covering the truss frame with a sheathing of boards for the slating. This was nearly done the next day, the plaintiff working as before mentioned, when at about 2 o'clock in the afternoon, as the plaintiff states, the occurrence took place. The building was being erected on land of the defendant over the creek and within this city. The plans and specifications for it were made by the defendant's agent Jones.

The facts given you are not in controversy; but as out of some of them arose this action, it becomes important that you should keep them in mind while I am putting before you the law applicable to them as understood by the court. This law must be your guide in reaching a conclusion or rather in making up your verdict.

The plaintiff and defendant from the time of the employment of him by it, bore, in law, the relation of master and servant—the corporation defendant being the master and the plaintiff the servant. Whenever that relation, or status exists, the law attaches to it certain correlative duties, or obligations on the part of the master to the servant and the servant to the master. And there are also certain implied undertakings between them. Of the latter is that on the part of the master that he will treat his servant well and pay him his just wages, if none have been especially agreed upon ; and, on the part of the servant, that he is reasonably qualified to perform the service he undertakes. Of the duties which attach to the relation, there is, on the part of the master, that of providing the servant with safe and proper implements and tools to work with (in cases where the master supplies these) and a place of safety to work in, or upon, and of keeping him from exposure to danger while at work, from any causes or sources within the control of the master, and not incident to the employment or trade of the servant.

The correlative duty of the servant is to faithfully perform the requirements of his service to his master which he has undertaken, and in so doing, to obey and observe all orders of a legal, proper and suitable nature, with respect to his service. These exist without any special contract between the parties; for they are legal duties imposed by the system of law by which our rights are recognized and secured to us.

It follows, from this statement, brief but I hope sufficiently plain to be easily understood, that when on either side any of these duties are disregarded, or not performed, and the party entitled to their observance or performance suffers injury thereby, he is entitled to an action in a court of law to recover such sum of money, by way of damages, as he can prove to a court and jury that he is entitled to by reason of such default. The plaintiff has shown to you by the testimony of himself and his witnesses what the injury to him was, in consequence of the falling of the building of the defendant, and asks damages to the amount of $20,000 at your hands: the defendant denies that he is entitled to any, insisting that it was the duty of the plaintiff to take notice of the structure he was to work upon before he ascended to its roof; and, though denying that the defendant had any reason to believe that the brick wall was unsafe, it is claimed and insisted upon that any want of safety that attached to it, was as open to observation by the plaintiff as by the defendant. It is certainly true, as a general proposition—that when one voluntarily undertakes a perilous service at the instance of another—as a servant for a master—and the peril is either as well known to the former as the latter, or by the exercise of prudent care on the part of the former (and which it was his duty to take) he might become acquainted with it, he will have no right to an action against his master if he be injured while in the performance of such service. Why? Because he is held to have undertaken the risk of the peril attendant upon the service, and was paid for taking it. A man offers himself, for illustration, to a farmer as a competent person to feed a wheat machine (a dangerous service), and is employed for that purpose. If he be injured in this service, he cannot recover from his employer, unless he can show that there was defect in the machine known to the latter, and which was not disclosed to him, or which was not such a one as was obvious to a

person acquainted with the service—and that the injury was caused by such defect. This rule for a case of that sort will apply to all employments where the service is of such a nature as necessarily requires at the hands of a servant that he should make a previous examination before he undertakes that service, unless the master has undertaken specially that he will guarantee him against all danger from it. The servant's duty, to the extent to which it goes, is in that respect of equal obligation with that of the master. Such a rule, however, may be extended too far; and, in our opinion, will be extended too far, whenever there is required the same degree of circumspection on the part of a servant entering a service a part of the duties of which with respect to their nature and quality are not at all within the scope of his undertaking, as there would be where the danger encountered is that ordinarily incident to his special employment. Such danger, in this sense, is not that resulting from the negligence or insufficient performance of duty by another, unless his attention is either called to it particularly, or it is so obvious as to compel him to notice it. Why is this? Because of the duty on the part of the master of which I have before spoken. If the injury is caused (as in this case the plaintiff claims it to have been from the falling of the entire structure from the alleged insufficient brick wall) by a distinct part of the general work done by other servants, the duty of prudent caution, or circumspection, did not rest with the same weight upon the injured servant as it would have done, if his injury had been occasioned by defective work or material within his own particular line of labor. Against the former he has the master's duty, before spoken of, to protect him—from which the master cannot be relieved by claiming that knowledge of the danger from such other work was as open to the servant as to him, unless it was so obvious as to fasten the servant with knowledge of it. In this case the brick wall was, by the accident that befel the building, shown, according to the plaintiff's proof, if you believe it, to be unfit for the service cast upon it; but no one called the attention of the servant to the fault of it in that respect; and his particular employment of carpenter, does not appear to us to have required of him that he should notice the wall to see whether it was capable of sustaining him safely while he was at work upon it, especially as most of the service upon the roof in his

line had so far progressed, that but little was necessary to be done to complete the carpenter's work entirely upon the roof. In the view we take of this case, he was, under the facts and circumstances proved on both sides, no more bound to inspect the wall of that building before he went upon the roof to ascertain the safety of relying upon it, than would an engineer about to take service with a railroad company be bound before doing so, in order to secure to himself a right of action against the company in case of injury by the breaking of a decayed bridge or culvert to first go along the line and inspect the road over which he was to drive his engine. Such caution, circumspection, or diligence, would not be required of him; why then of a carpenter who is employed to go upon a roof frame to sheath it, that he should previously inspect the walls of the building to determine their fitness to support the roof and him and other workmen? Can any satisfactory reason be given? In this case it would seem to be especially hard, in view of the undisputed proof that the defendant contended before the wall was built that it would be adequate to support or carry the roof, and has introduced in its defence witnesses to prove its sufficiency. There is of course great conflict of testimony upon this point; but that very difference among witnesses, claimed, on each side, to be competent experts, shows how improper it would be to hold an inexpert in regard to walls as the plaintiff was, to the rule that he took the risk of the wall when he engaged in the service of the defendant. That however, is a matter for you.

The contention of the defendant, as has before been said is, that the wall was sufficient to carry the weight imposed upon it; and in this he has the support of witnesses called on his behalf. But it must not be lost sight of, when you come to deliberate upon this case, that the witness Simpson tells you he spoke to the president of the defendant company—Mr. Mendinhall—at the time they were discussing the plans, suggesting that the wall was thin and that another four inches added to it between the pilasters would make it look better and stiffen it up. What the witness meant by such language and whether the president understood it as so meant is for you to decide; but he further tells you that Mr. Mendinhall proceeded to argue the subject with him, and that he then let the matter drop, or words to that effect. Mr. Enos another

witness, also tells you that he too spoke of the thinness of the wall before the work on it began, or at or about that time, to other agents of the defendant.     Thus the defendant, if you interpret the language of those witnesses as so meaning, was apprised beforehand by competent judges that the wall would be inadequate.     Again, the then building inspector of the city—the witness Philemma Chandler—was at the site of the new building after the work of laying the wall had been begun and before it had progressed very far, and expressed himself to the contractor Simpson and Mr. Davis to the effect that if there was to be any lateral pressure on the wall it would not do and that he would have pulled it down if it had not gone too far.     In addition to this there is in proof before you the building regulations of the city of Wilmington in relation to the size, etc., for outside walls for rooms with truss roofs such as this building had—the seventh of which, in two of its consecutive sentences, reads as follows : " The outside walls of buildings having truss roofs, such as churches, public halls, theatres, restaurants and the like, if more than 16 or less than 75 feet high, shall average at least 17 inches in thickness ; if over 25 feet in width and less than 40 feet in hight, the walls shall be 21 inches thick ; if over 40 feet in height, then the same to be 26 inches thick ; the stone walls for the foundations, or cellar walls, must be at least four inches thicker than the brick wall of the first story.     Any building constructed, altered or erected to a greater height than the specifications in this section, or for other purposes, the increased thickness of the wall, if necessary, shall be determined by the building inspector."

Undoubtedly the city had very good reasons for enacting such regulations, the chief object of which, at least must be taken to have been, security of the lives of those having occasion to resort to or frequent them.     The term having trussed roofs applied to the outside walls of such structures includes as well factories, or other buildings, where the calling of people is exercised from day to day, as the buildings mentioned, which we think were designated simply for illustration ; and also that it applies as well to such a building with one brick wall as one with four of such ; otherwise the regulation would not accomplish what we conceive to have been its obvious intent.     The defendant, therefore, had the opinion of his

builder that the wall should be thicker to stiffen it up—like information in effect from the actual workman, Enos—the declaration of the building inspector before the walls had advanced far towards completion—and additionally the city building regulations—enough in the contention of the plaintiff, to have warned the defendant that the wall about to be built would be dangerous, although nobody used that particular term in regard to it. Whether it was enough, or not, is for you to decide and we abstain from expressing any opinion about it, except to say that the erection of the wall contrary to the ordinance is of itself presumptive evidence of negligence. If you think there was enough information to apprise the defendant of the probable danger of the building from falling from lateral pressure (which the wind undoubtedly made) then the duty of diligence and care I have before spoken of as obtaining on the part of the master toward his servant, was not performed in this case, and the consequences thereof resulting to the plaintiff, supposing him to have been guilty of no neglect of actual requirement of care on his part, must fall upon the defendant. Of that requirement I have spoken before and it is not necessary to repeat what I then said. The defendant seems to have relied upon the opinion of its own official servants as to the sufficiency of the wall in question to support the roof that was erected upon it—not calling in the judgment of engineers or architects, whose special business it is to design buildings, fix the thickness of their walls, the support necessary for the maintenance of them in their proper position, and do all other necessary things in the line of their profession for the guidance of the builders in the erection of buildings. It is true the defendant was not without assistance in that respect, for witnesses were produced who consulted with the president about the plan he proposed. But they were the official servants I have spoken of, who have testified to the sufficiency of the wall that fell, for the purpose it was to serve. But none of them, as I remember, ever followed the profession of an architect exclusively, or for any considerable length of time; and by the testimony of such professional architects as were examined for the plaintiff and who live in this city they are unknown to the profession as such. Still, it is not by any means conclusive evidence that they had not the requisite qualifications as architects—it being for you to decide

whether in a work of peculiar construction as 'the building that fell is proved to have been, the defendant ought not to have secured the skill and training of an architect devoted to that profession, rather than trust it to its own officers or servants, engaged chiefly in other engagements in its service.  The defendant did not secure such extraneous aid, but chose to rely upon its own resources in this respect.  If you believe the serious and to some extent fatal consequences resulting from the falling of the building were attributable to the inherent defect in the wall from its thinness, then the defendant must answer for such consequences by your verdict.  But no resort to any architect for advice would have protected the defendant in building an unsafe wall.

The plaintiff's action is founded upon the allegation that the building in question fell, in consequence of the mistake made by, and want of due care on the part of the defendant in erecting the brick wall on Heald street, part of the new rolling mill, of the dimensions which have been proved and admitted.  The defendant denies that there was any error or want of due diligence in building such wall; and each has produced witnesses in great number to maintain the issue thus agreed upon between them.  I have already given you the law in regard to the case and diligence required of the defendant in this case; and it is for you to say whether the defendant duly observed it.  So I have already pointed out to you the general duty attaching to or incumbent upon servants in entering upon a service in itself a dangerous one, and, endeavored to make myself understood in giving it as the opinion of the court, that as the plaintiff in this case was a carpenter and employed as such by the defendant whose duty it was to make the pursuit of his employment safe, the risks strictly incident to it only excepted, he, the plaintiff, had the right to rely upon the due and faithful performance of its duty by the defendant, and was not bound to take the extraordinary care of inspecting the walls of the building in going upon the roof to work.  And this is all the more reasonable, because the defendant itself had erected the wall and avouched its safety by putting its servants to work upon it.  I gave an illustration to show how unreasonable such a requirement of extraordinary care by the plaintiff would seem to be.  Still, we do not ourselves undertake to pass upon that question, but leave it to you to

decide, along with the question of the defendants' negligence or want of due care, under all the circumstances, in erecting the wall as was done.　.

Should you decide, in view of all the testimony on both sides, that the wall was sufficient, not only to support the bare weight of the roof, but to *carry it* to use an appropriate expression by the architect, Theophilus P. Chandler, in the usual exigencies of storms of rain and wind that assail buildings, then the defendant should be given your verdict; but if you find, on the contrary, that it was not adequate to that service, or requirement, then your verdict should be for the plaintiff. But the defendant insists, that the storm that occurred at 2 o'clock in the afternoon of July 29th, 1885, was an extraordinary one, against which the prudent caution which it claims was exercised, in the erection of the wall, to insure safety, and which it alleges was adequate and all the law required, could not avail; and that the building gave way under its violence; that it was of a phenomenal character defying the ordinarily sufficient precaution against casualties from the weather. The plaintiff, on the other hand, claims that the storm was not an unusual one at all, but the common thunder storm of the summer; and that no building adequately constructed would have gone down before it. Both sides fortify their contentions with testimony of witnesses of the value and weight of which you are the sole judges. The plaintiff supplemented the testimony of his witnesses, as to their personal observation and experience, with the fact, testified to by the reporter of one of the daily papers of this city whose business it is to gather news of an interesting character for his paper, that no information came to him of injury to any other building in the city from that storm. If you should find that the building would have resisted any usual storm in this latitude the same as other similar buildings, of large proportion and well built, do: but that the storm that overthrew it was extraordinary, such as builders do not provide against, or contemplate, in planning their architecture, then the defendant is entitled to your verdict. But the plaintiff is entitled to it unless the defendant shows this to your satisfaction. *Prima facie* when a building falls, it is from negligent or insufficient construction; it lies upon a defendant, who is such on that account, to prove that causes over which he had no

control, and for which he is not responsible, brought about the result. It is a most unusual thing for a house to fall to the ground, and he who by no fault of his suffers injury by it has the right to call upon the owner for compensation for such injury. If he resists the action he must show that he was in no default whatever.

I have a few words to say in regard to damages. There was no estimate or any paper handed to the Court regarding what the damages to be claimed were, except something was said about what we call vindictive or exemplary damages.

The damages to which we feel that the plaintiff is entitled, if you think he is entitled to any, are for the expenses incurred by him in being treated and attended in endeavoring to be cured ; for his bodily pain and suffering. Nobody can estimate that exactly in money. It is a question that must be passed upon by the jury : hindrance from pursuing his employment as a carpenter and transacting his other business, and loss of wages from his disability and by reason of its permanency, if it be so. He has stated to you the wages he was earning, the loss of which, it seems to us, you must take into consideration. As to the expenses incurred so far as his being cured, etc., are concerned, and what he suffered from any injuries that might exist at that time, or that continued to exist long after, from these pains in the back, and his hindrance, through being disabled, from earning his living as before he was accustomed to do. These are the things you must decide. He was a carpenter by trade and a cabinet maker by trade, and these trades require that a man shall stand : He cannot sit down. You must do the best you can, but give, on no account, exemplary damages—damages to make the defendant an example of or to punish it. It is not a case of gross negligence in any way on the part of the defendant. If you think it a case of negligence, it is a case of the lack of the sort of diligence which careful and prudent men ought to have observed ; and we have given to you examples in which a prudent man should act in undertaking to erect a building of this kind. I now leave this case to you.

I think the charge we have delivered to the jury will cover all that has been said on the other side in their instructions ; if not, if the counsel will tell me any points that have not been considered, I will take up their instructions one by one.

*Mr. Bradford*—As I understand the matter, all of the insructions have not been covered, as written upon the paper handed to you.

CHIEF JUSTICE—Then I will take the matter up. When the charge covers instructions, the Court are not bound to review the points which the charge covers.

The Chief Justice then read separately the instructions presented by the defendant's counsel and said : "We decline to give instructions on the point covered by the first, as we have already instructed you on that point when we said that a man ought to exercise due care in a case of that kind, and must take something beyond the ordinary care in putting up a building of that kind. We also decine to give instructions in the second, as we have likewise considered that point.

On the third we gave you the instance of an engineer ; that he is not bound to go along the road and inspect it before running his engine upon it. The law holds no man responsible for not taking cognizance of such things in an employment and duty of that kind.

The fourth we decline to take cognizance of the first part for the reason that I have just given. And the next, because it presupposes that the defendant is excused from the duty of noticing what the building should be, whereas his duty required him to know whether it would be safe for those working on it.

The fifth instruction we decline to give because the president of the defendant, Mr. Mendinhall, was talked with and consulted about the plans and the plaintiff could not have had equal knowledge of the defects in the wall, and it is improper for us to give you instructions of that kind on any assumption that he had.

As to the sixth, there is no objection to the part that defendant had a right to rely upon the plaintiff's competency in his employment; but he had no right to be apprehensive and avoid the danger that he might have observed by the exercise of ordinary care and prudence, as stated in this instruction.

These are very carefully drawn instructions and somewhat difficult to answer.

On the seventh point I have already addressed you and told

you that unless the storm was a phenomenal one such as buildings do not provide against and do not contemplate, that one is liable if the building fall by reason of that storm.

The eighth is refused because it is assumed that 13 inches would be thick enough, whereas it is not proved. It is proved that the wall ought to be 17 inches thick.

The ninth is refused as allowing the jury to speculate concerning an uncertain fact, there being no proof of the fact.

Primarily the tenth instruction is all right, but having proved negligence the defendant was bound to due diligence.

As to the eleventh, in the prosecution of a case of this kind, if it was not plaintiff's negligence he is bound to show it. His whole case was tried upon that theory.

Verdict for the plaintiff.