# CHARLESTON.

PERRY, ADM'R. *v*. OHIO VALLEY ELECTRIC RY. CO.

Submitted January 16, 1912.    Decided April 15, 1913.

1.    MASTER AND SERVANT—*Assumption of Risk—Electricity.*
     A servant employed to reset electric poles, requiring his climbing amongst live wires for the purpose of attaching a pulley to the old poles, used in hoisting the new ones, assumes the risk of all ordinary dangers incident to so hazardous an employment, but not the risk of unknown and abnormal dangers due to the master's negligence.    (p. 284).

2.  SAME—*Injury to Servant—Actionable Negligence—Electricity.*
    It is negligence for which the master is liable to a servant,
    so employed, who is injured or killed on account thereof, to
    permit a joint, or connection, to be made in a highly charged
    electric wire and remain uninsulated, and so close to one of the
    metal braces supporting a cross-arm on the pole as to charge it.
    (p. 283).

3.  SAME—*Safe Place to Work—Inspection by Servant—Electricity.*
    The master, acquiescing in the use which his servant makes
    of the old poles, in performing his work, is bound to see that
    the wires thereon are not in an abnormally dangerous condi-
    tion.   The rule in regard to reasonably safe appliances with
    which to work applies, and the servant is not required to make
    inspection.   (p. 286).

4.  SAME—*Injury to Servant—Contributory Negligence—Question
    for Jury.*
    In view of the evidence in this case, the question of contribu-
    tory negligence is held to be a fact for the jury to determine.
    (p. 287).

Error to Circuit Court, Cabell County.

Action by John W. Perry, administrator, etc., against the Ohio
Valley Electric Railway Company.   From judgment for plain-
tiff, defendant brings error.

*Affirmed.*

*Vinson & Thompson,* for plaintiff in error.

*L. D. Isbell, J. W. Perry,* and *Holt & Duncan,* for defendant
in error.

WILLIAMS, JUDGE:

Trespass on the case by the administrator of Clifford R. Dug-
ger, deceased, to recover damages for his unlawful death, al-
leged to have been caused by defendant's negligence.   Verdict
and judgment for plaintiff for $7,500, and defendant was awarded
a writ of error.

Deceased was in the service of defendant as foreman of a gang
of men engaged in erecting electric poles.   Two methods are
commonly employed in raising them.   One is to lift them by means
of spike-poles, and the other is, if they are being erected to take
the place of old ones, to hoist them with block and tackle attached

72 W. Va.

to the old pole.   On the 12th September, 1910, deceased was pre-
paring to hoist a pole at the corner of 3rd Avenue and Seventh
Street in the City of Huntington.   He ascended the old pole,
which was equipped with a primary wire carrying 2300 voltage,
a transformer and telephone wires, and had fastened the block and
pulleys to the pole, just above the lower or third cross beam, and
had begun to descend, when J. W. Sturgeon, defendant's general
line foreman, who was standing near the foot of the pole, called
to him that the "fall" line was not properly adjusted, that it
should hang next to the pole instead of on the outside of the
block, as it was.   Deceased then returned, adjusted the rope and,
in descending the pole, caught hold of one of the metal braces
supporting the cross-arm.   The brace being highly charged with
electricity and his body coming in contact with one of the tele-
phone wires, a short circuit was formed, and he was killed.   There
was an uninsulated joint, three inches long, in the primary wire,
which, by contact with the brace, caused it to become charged
with a deadly current of electricity.

Workmen in climbing the pole were liable to come in contact
with the exposed joint, and it was liable to come in contact with
the brace.   It was negligence to leave it in such a condition.
*Mitchell* v. *Coal Co.*, 67 W. Va. 480; *Thomas* v. *Electrical Co.*,
54 W. Va. 395; and *Thornburg* v. *R. R. Co.*, 65 W. Va. 379.   It
is a common practice among pole climbers to take-hold of the
metal braces, and if the wiring is normal, there is no danger in
doing so.

But non-liability is claimed on two grounds:   (1) assumption
of risk, and (2) contributory negligence.   The availability of the
first defense depends upon the scope of deceased's employment.
If he was employed to do any and all kinds of work in repairing
an old line which he knew was abnormally dangerous, then he
assumed the risk of all the dangers incident to that kind of work.
If he knew the wires, as well as the poles, were out of repair, and
was employed to put both in proper condition, while the current
was on the wires, the cause of his death was one of the assumed
risks and plaintiff can not recover.   If such was his knowledge
and such the scope of his undertaking, he must have expected to
encounter such dangers as the one that caused his death. · ·

But if he was simply employed to set poles, and did not know
that the wires were in an abnormally unsafe condition, he had a

right to assume that they were no more dangerous than similar wires, in like use, ordinarily are. If such be the case, the exposed wire was an extraordinary hazard which he did not assume because it is not reasonable to suppose he could have anticipated a condition so abnormal and unusual. The law does not burden the workman with the assumption of extraordinary risks. He assumes only such as an ordinarily prudent man knows are incident to the employment. However dangerous the employment, the workman is never held to assume risks not ordinarily incident thereto, and of which he has no knowledge. 1 Labatt, sec. 270.

The scope of deceased's employment was a fact for jury determination, and we think they could very properly infer from the testimony of defendant's own witnesses that it was limited to setting poles. He had worked as a member of the same gang of which he was made foreman, under another foreman by the name of Shafer, from sometime in June to sometime in August, 1910, when Shafer quit. He then applied to W. W. Magoon, defendant's general manager, for the position of foreman and was employed as such. Mr. Magoon testifies that he then said to him: "You must remember that this work down here takes a very careful man, a man who knows how to handle live wires, because that work has got to be done with live wires, in order to keep our service going in town. He said, 'I can handle that all right,' and I then gave him instructions. I said 'all right, go ahead,' and he took charge of the work." On cross-examination he said: "Q. He was removing old poles and putting in new ones at the time? A. He was working in the line of his work; yes, sir. * * * Q. His duty was simply to put in new poles, was it? A. No, sir, his duties were to make all corrections on that line, changing the wires and general line of work." But he had been working in this gang, either as a common laborer or as foreman, from June to 12th September, and there is no proof that he ever transferred a single wire from an old pole to a new one.

J. W. Sturgeon, who was the "line foreman," testified, on his examination in chief as follows, viz.: "Q. Do you know who had charge of the work that was being done there at that place, Mr. Sturgeon? A. What do you mean, what time? Q. At the time this accident occurred? A. Mr. Dugger had charge of setting the poles. Q. Was there anything else being done? A.

Nothing only setting poles at that time." On cross-examination, he testified as follows: "Q. You were foreman there, were you, Mr. Sturgeon? A. I was foreman over the whole line; yes, sir. Q. And Dugger was under you, was he? A. Yes sir."

The rule in regard to a safe place and safe appliances applies in this case, because the old pole was a means or appliance which deceased used in the performance of his work, with the master's acquiescence. It was, therefore, defendant's duty to see that the wires on the pole were in a reasonably safe condition. Deceased was bound, of course, to take notice of whether the strength of the pole was sufficient for the purpose for which he was about to use it, because the new one was being erected to take its place, and that was sufficient to put him on guard as to any defect in the pole, but he was not chargeable with the duty to use extraordinary care to avoid unknown danger from imperfect wiring. There being no proof that the line was being repaired because the wires were bad, or imperfectly strung, deceased was not bound to use extraordinary caution. He was not required to inspect the wiring to see if there were hidden dangers or latent defects. This case is distinguishable from *Wheeling* v. *Lumber Co.*, 70 W. Va. 122, cited by counsel for defendant. In that case Whorley was assisting in installing machinery in a saw-mill and was injured by the bursting of a steam pipe while he was tightening a leaky joint in it. In the present case deceased was killed while making use of an electric pole, an already completed appliance, as a proper means of accomplishing the work he was set to do. He was neither installing nor repairing the appliance that killed him. The case is more analogous to *Madden* v. *Minneapolis &c. Ry. Co.*, 32 Minn. 303, 20 N. W. 317, in which Madden, a brakeman on a gravel train, was injured because of a defect in the old track over which gravel and ties were being hauled for the purpose of repairing it. The company was held liable. Says the court: "The fact that the work in which plaintiff was employed was that of repairing or making preparations to repair the track did not diminish its duty to furnish safe and suitable means and instruments to do his work. As it required him in that work to use the old track, it should have had it reasonably safe for the purpose." That the appliance, the old pole in this case, was not erected and equipped with reference to its use as a means for erecting new poles, can make no difference in the application of

the principle that it is the master's duty to furnish reasonably safe appliances, because defendant knew that the poles were constantly so used, and acquiesced therein.    The proof is that block and tackle, attached to the old pole, was a usual and customary means employed in raising poles.    "The master's acquiescence in the use of an appliance for some purpose other than that for which it was intended puts him in the same position as if the appliance had been originally furnished for that purpose."    1 Labatt, sec. 28.    The same rule was applied in the following cases which are very similar to the Madden case: *Dunn* v. *New York &c. R. R. Co.,* 107 Fed. 666; *Lauter* v. *Duckworth,* 48 N. E. 864 (Ind. App.).    The rule applied in cases of injury to a servant by falling platforms, erected by the master for the use of his servant, is the proper rule to be applied here.    In such cases it is uniformly held:    (1)    That the servant is not bound to make inspection; (2) that the workmen who prepare the place or appliance are not fellow servants to those who are employed to work in the place or with the appliance; and (3) that the master is liable if the defect causing the injury was unknown to the servant.    *McLean* v. *Standard Oil Co. of Indiana,* 21 N. Y. Supp. 874; *Benzing* v. *Steinway & Sons,* 101 N. Y. 547; *Goldie* v. *Werner,* 50 Ill. App. 297, affirmed in 151 Ill. 551; *Hines Lumber Co.* v. *Ligas,* 172 Ill. 315; *Giles* v. *Diamond State Iron Co.,* (Del.) 8 Atl. 368; and *Cole* v. *Warren M'f'g. Co.,* 63 N. J. L. 626.

Whether deceased was guilty of negligence, contributing to his death, was likewise a question of fact for the jury.    It is contended that his failure to see that the untapped joint in the primary wire rested against the metal brace was proof of his negligence    It is proven that he was an experienced lineman, and that he climbed the pole in the usual manner.    He ascended it on the side opposite the transformer, and the metal brace came between him and the exposed joint in the wire.    There is evidence tending to prove that a person in his position could not see whether the wire came in contact with the brace or not; and, it being an unusual condition, he may not have been on the lookout for it.    He may have noticed that the insulation on other parts of the primary wire, which he could see, was sound and in good condition, and he may have supposed that the parts he could not see were equally good.    He had a right to assume that defendant

had performed its duty, and that the wires were normal, both as to place and condition, because the evidence is that it is the custom to tape such joints when made. The primary wire carried 2300 voltage, and the untapped joint, so close as to touch the brace, made the position of deceased extraordinarily dangerous. He was not bound to anticipate such danger. A number of persons were present, around the pole, when deceased was killed, among them defendant's line foreman, and none of them knew that the primary wire was against the brace. It was not discovered until afterwards. That no other witness saw it, is evidence tending to disprove that deceased was negligent. And, that witness Rodgers climbed the pole a few minutes before, and found it charged and hot, is not conclusive that deceased was negligent. Why did not Rodgers discover the cause of its being charged? Such evidence is a sword cutting both ways, and the jury considered it.

There were two theories of the case, depending upon the scope of deceased's employment as affecting the risk which he had assumed, and both were fairly presented by the court's instructions to the jury. We find no error and affirm the judgment.

*Affirmed.*